ing, it is important that its amount should be stated, so that it can be seen whether the counterclaim exceeds or is less than the claim of the plaintiff set forth in the complaint. To enable the defendant to state the amount of his counterclaim with any degree of accuracy, of course it is necessary that he should know the amount of sales made by the plaintiff. He says that no account of such sales has ever been rendered to him or to his assignor. I do not think that, under the circumstances, the court can consider this merely as a "fishing excursion" for evidence, although, like all cases for the inspection of books or documents, it necessarily enables the party to procure evidence, or satisfy himself of the lack of it. While the plaintiff in his petition is able to state the terms of the contract under which his assignor was to receive commissions, and is enabled to allege that they have sold many thousands of dollars worth of the water traps, still information which proceeds no further than that is not sufficient to base a good pleading upon. And, where the necessary information to perfect his pleading is contained in books or documents in the exclusive possession of his adversary, I think that he is entitled to inspect such books and documents in order to gain the necessary information. My attention has been called to the case of Gross v. Bock (Sup.) 1 N. Y. Supp. 263, where it was held that the court would not grant an order for inspection, in the absence of proof of a demand for such inspection, and a refusal. It was placed upon the ground that the court should not be vexed with unnecessary applications, it appearing upon the argument in that case that the adverse party was willing that the party seeking the inspection should have free access to the books sought to be examined. In this case no such willingness has been expressed, and the plaintiff had an opportunity to comply with the defendant's desire for an inspection before the matter was brought to this court. As first herein stated, the county judge made an order for the inspection, coupled with an order to show cause, in the event of the plaintiff's refusal to grant such inspection. The plaintiff declined to grant it, but appeared here upon the order to show cause why an order should not be made compelling him to allow his books to be inspected.

I think the order of the county judge, with the refusal of the plaintiff to comply with it, takes the place of a demand and a refusal, which makes it both proper and necessary for the court to interpose. No objection has been made to the terms and conditions under which said inspection is to be made. The order is therefore granted, with $10 costs, to abide event of the action.

---

(12 Misc. Rep. 187.)

PEOPLE ex rel. WAYSIDE HOME v. BOARD OF SUP'RS OF KINGS COUNTY.

(Supreme Court, Special Term, Kings County. April, 1895.)

1. CONSTITUTIONAL LAW—ABROGATING INCONSISTENT STATUTE.
    Const. 1895, art. 8, § 14, providing that payments by municipalities for the support of inmates of charitable and reformatory institutions not

wholly under public control "may be authorized but shall not be required by the legislature," operates directly on Laws 1892, c. 439, § 4, making such payments imperative, and changes the command to pay into a permission.

2. SAME—EXISTING RIGHTS.
　　Claims accruing under the act of 1892, before the constitutional provision took effect, are not affected thereby.

Action by the people of the state of New York, on the relation of the Wayside Home, against the board of supervisors of Kings county, for a peremptory mandamus to compel the board to pass upon two bills. Granted as to one bill, and refused as to the other.

William J. Carr, for relator.
George F. Elliott, for respondents.

BARTLETT, J. The revised constitution of this state provides that "payments by counties, cities, towns and villages to charitable, eleemosynary, correctional and reformatory institutions wholly or partly under private control, for care, support and maintenance, may be authorized but shall not be required by the legislature." Article 8, § 14. This provision went into effect on the 1st day of January, 1895. The Wayside Home is a reformatory institution, under private control, in the city of Brooklyn, to which magistrates are authorized to commit certain classes of females. Under the statute, it is made the duty of the county treasurer of Kings county to pay to the managers $110 a year, or a less sum, at that rate, for the time any inmate may remain in the institution, for her support and maintenance. Laws 1892, c. 439, § 4. The language of the act is mandatory, the word "shall" being used. There is a provision, however, that the charge for support and maintenance must first be passed upon by the board of supervisors, in the manner provided by law for the payment of county accounts. This means that the board is to ascertain the correctness of the bill, so far as the number of inmates is concerned, and the time of their stay. These facts being established, the rate of compensation is fixed, by the terms of the statute itself, at $110 per annum. The Wayside Home has presented to the board of supervisors two bills, which they have refused to audit. One is a bill for the quarter ending December 31, 1894. The other is a bill for the quarter ending March 31, 1895. The present proceeding is an application for a peremptory writ of mandamus to compel the board to pass upon both.

As to the first bill, I think there can be no doubt that the relator is entitled to have it audited. The claim accrued wholly before the revised constitution went into effect. There is nothing in the provision which has been quoted from section 14 of article 8 to indicate that it was designed to operate retroactively, and in the absence of such indication the rule is the other way. Cooley, Const. Lim. (6th Ed.) p. 77.

A more serious question arises as to the second bill, which is for support and maintenance furnished and afforded since the revised constitution took effect. Does the provision of section 14 in article 8 relate only to future legislation, or does it act upon existing stat-

utes, so as to modify or repeal them, as far as they are at variance with its requirements? If the provision relates only to future legislation, it leaves in full force the act of 1892, which not only authorizes, but requires, Kings county to pay for the support and maintenance of inmates of the Wayside Home. On the other hand, if this constitutional provision operates directly upon existing statutes, its effect is to modify the act of 1892 by striking out the command that the county shall pay, but leaving still in force the authorization to pay if the county sees fit to do so. I am satisfied that the latter view is the correct one. It is plain that a portion of section 14 was intended, not merely as a restriction on subsequent lawmaking, but as a prohibition which should affect action to be taken under existing laws. This is true of the sentence which immediately follows the provision under consideration here, and which sentence is in these words: "No such payments shall be made for any inmate of such institution who is not received and retained therein, pursuant to rules established by the state board of charities." Here we have a command which indicates an intention to establish a new rule which should be applicable at once to all payments to be made after the constitution went into effect, whether under laws already on the statute book, or laws thereafter to be enacted. Viewing both sentences together, I think the same intent is manifest in the language of the preceding provision, which declares that payments of this kind may be authorized but shall not be required. The purpose seems to have been to provide that after January 1, 1895, payments by municipalities for the support of the inmates of charitable and reformatory institutions, not wholly public, should under no circumstances be compellable, but should be permissible, provided the inmates were received and retained under the rules of the state board of charities.

I think the case at bar is distinguishable from the decisions cited by the learned counsel for the relator in support of his contention that the provision in question here was not designed to affect anything but the future action of the legislature. The South Dakota case of Cutting v. Taylor, 51 N. W. 949, arose out of a territorial statute authorizing certain payments by the territory to cities for the benefit of certain fire companies. When the state government came into existence, the territorial laws continued in force, so far as they were not repugnant to the state constitution. That constitution declared that the state should not make donations to or in aid of any individual, association, or corporation. It also contained provisions as to the manner in which appropriation bills should be passed. The state auditor, in resisting an attempt to enforce payment under the statute, insisted that such payment was a donation contrary to the constitution; and the opinion of the court shows that it would have been so held, were it not that the statutory offer, and the subsequent action of the firemen, constituted a contract by which the state was bound. Another objection, that the statute was not passed as the constitution required appropriation bills to be passed, was properly pronounced untenable, as constitutional provisions relative to the form and method in which

appropriation bills should be passed refer solely to legislative action in the future.   In the case of People v. Gardner, 45 N. Y. 812, it was held that the limitation of 70 years, applicable to judges elected under the judiciary article of the constitution, which went into effect January 1, 1870, did not apply to a county judge chosen for a term of 4 years at the preceding general election.   This was not because of any general rule forbidding the application of a constitutional provision to an existing state of things, and limiting its operation to a state of things to arise thereafter, but because the court perceived that the limit of age was appropriate to the lengthened terms of judicial service only, and inferred that the convention which formed the judiciary article did not intend that it should abridge the shorter terms of judges previously elected.   In Re Gilbert Elevated Ry. Co., 70 N. Y. 361, and the case of People v. Brooklyn, F. & C. I. Ry. Co., 89 N. Y. 75, it is no doubt plainly declared that the constitutional amendments of 1875 relative to the construction of street railroads refer solely to future legislation, and not to previously existing laws.   But the language of the constitution there under consideration was clearly in future, and was not immediately coupled with provisions necessarily operating upon statutes in force at the time of the adoption, as is the case here. The whole scope of the section involved in those cases was "to dictate to the lawmaking power what it may or may not do thereafter, what bills it may pass, and what it shall not, and not at all to affect or act upon past legislation, which at the time was entirely lawful."   Here, I think, the scope of section 14 of article 8 of the revised constitution is to put an end to the compulsory municipal maintenance of the inmates of private charitable and reformatory institutions, but to allow its continuance, at the legislative will, with the consent of the municipalities concerned.   The last case on the relator's brief which it seems necessary to discuss is Allbyer v. State, 10 Ohio St. 588.   The constitution of Ohio provides that all laws of a general nature should have a uniform operation throughout the state, and also contains a declaration that all laws not inconsistent therewith should continue in force until amended or repealed.   The plaintiff was convicted under a statute enacted before the constitution, and applicable to one county only.   The question presented was whether that statute could be upheld, as against the constitutional requirement of uniformity in the operation of laws of a general nature; but the supreme court held that this requirement related to future legislation only, inasmuch as any other construction would result in setting aside most of the special laws of the state.   No such serious or other evil consequence is involved in the interpretation now put upon the constitutional provision which is before us in the case at bar.

The conclusion is that section 14 of article 8 of the revised constitution acts directly upon existing laws of the same character as the statute which provides for payments by Kings county to the Wayside Home.   It does not repeal those laws, except as to this extent: the command to pay is changed into a permission to pay, always provided that the inmates of the institution are received and

retained under rules prescribed by the state board of charities. In the present proceeding, it was stated and conceded upon the oral argument that the inmates of the Wayside Home are received and retained under such rules. As to the bill,' therefore, which has accrued for their support and maintenance since the revised constitution went into effect, the county, through the board of supervisors, has the power, under the act of 1892, as modified by the constitution, to audit it, and direct its payment by the county treasurer. The county, however, cannot be compelled to pay it. The matter is left to the discretion of the board of supervisors, to be exercised for the best interests of the county. But upon the earlier claim, for support and maintenance furnished prior to January 1, 1895, the revised constitution has no effect, and the relator is entitled to a peremptory writ of mandamus directing the board of supervisors to pass upon it.